AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

FILED BY ___7M1___ D.C.

AUG 22 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

| United States of America | ) |
| v. | ) |
| JONNY ALEXANDER RAMOS, and MANUEL ANTONIO FUENTES RIVERA, | ) Case No. 19-8354-BER |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **October 12, 2018 - January 31, 2019** in the county of **Palm Beach** in the **Southern** District of **Florida**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to PWID a mixture and substance containing a detectable amount of cocaine. |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Shelton Hammonds, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/22/19

*Judge's signature*

City and state: West Palm Beach, FL

Bruce E. Reinhart, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF SPECIAL AGENT SHELTON HAMMONDS
## FEDERAL BUREAU OF INVESTIGATION

I, Shelton Hammonds, being duly sworn, do state and attest as follows:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and I have been so employed since June 2009. I am currently assigned to PB-2, the Violent Crimes and Major Offender Squad of the Palm Beach County Resident Agency. In this capacity, I have investigated bank robberies, gangs, the sale of illegal narcotics, and other violent crimes.

2. Over the course of my career, I have conducted investigations into the possession, sale, delivery, and trafficking of illegal narcotics and other controlled substances. I have participated in numerous narcotics investigations during which I have worked with undercover agents and confidential sources to purchase narcotics from street-level dealers, conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed recorded conversations and records of drug traffickers. Through my training, education, and experience, which has included debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, and surveilling individuals engaged in drug trafficking, I am familiar with the manner in which illegal drugs are distributed, the method of payment for such drugs, the methods used to finance drug transactions and launder drug proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. I am aware that drug traffickers often speak in guarded or coded language when discussing their illegal business in an effort to prevent detection. I am also aware that cellular telephones provide illegal narcotics traffickers with mobile access and control over their illegal trade. They often utilize cellular telephones to communicate with one another in furtherance of their illegal narcotics activities via both voice and text message communications. I have also conducted investigations involving the identification of co-conspirators through the use of telephone records and bills, financial records, drug ledgers, photographs, and other documents. During the course of my narcotics-related investigations, I have been instructed in and utilized various investigative techniques concerning distribution of illegal narcotics and conspiracies to commit these offenses, in violation of Title 21, United States Code, Section 841(a)(1). I have also become well versed in, and familiar with, the methodology utilized in the distribution of illegal narcotics.

3. This affidavit is based upon my own personal knowledge of the facts and circumstances surrounding the investigation and information provided to me by other law

enforcement officers. This affidavit does not contain all the information known to me about this case, but addresses only that information necessary to support a finding of probable cause for the issuance of a criminal complaint charging JONNY ALEXANDER RAMOS (hereinafter RAMOS) and MANUEL ANTONIO FUENTES RIVERA (hereinafter FUENTES), with conspiracy to possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4. On October 12, 2018, an undercover agent (hereinafter "UC") from the Palm Beach County Sheriff's Office met with a confidential informant (hereinafter "CI"). The CI informed the agent that the CI had prearranged a deal to purchase cocaine from a local narcotics dealer. Through investigative leads, the narcotics dealer was identified as JONNY ALEXANDER RAMOS. At approximately 9:30 a.m., the UC and CI met with RAMOS to conduct a narcotics purchase of approximately seven grams of cocaine. RAMOS told the UC and CI to meet him at the Seven Eleven convenience store located at 4048 Forest Hill Road, Lake Worth, FL. RAMOS advised he was waiting at the meet site inside a black Lexus.  Upon arriving at the meet location RAMOS was observed exiting the front passenger side of a black Lexus bearing license plate number HHR-U40, walked over to the CI's vehicle, and entered the car. The CI drove to the west side of a nearby business plaza and stopped. Upon stopping, RAMOS handed the UC a small gum box. Inside the gum box were two small clear baggies containing a white powdery substance.  The UC placed the suspected cocaine on a scale. The suspected cocaine weighed approximately 7.2 grams.  The UC gave RAMOS $280.00 in U.S. currency to complete the transaction. RAMOS and the UC discussed a future narcotics transaction for one ounce of cocaine and exchanged phone numbers. The CI drove RAMOS back to the location where the black Lexus was waiting for him. RAMOS exited the car, walked to the passenger side of the Lexus, and entered the car. The UC and CI drove away.

5. After the transaction was completed, the white powdery substance was field-tested and was positive for the presence of cocaine. A search of the Florida Driver and Vehicle Information Database (DAVID) indicated the black Lexus in which Ramos arrived was registered to Manuel FUENTES RIVERA, who resided at XXXX Rue Road, West Palm Beach, Florida.

6. On October 16, 2018, the UC contacted RAMOS via text message to arrange a controlled purchase of a half-ounce of cocaine. RAMOS agreed to conduct the drug transaction with the UC on October 18, 2018. The agreed upon purchase price for the half-ounce of cocaine

2

was $550.00 in U.S. currency.

7.     On October 17, 2018, the UC received a text message from RAMOS's cellular telephone number 561-294-XXXX. In the text message, RAMOS asked the UC if he still wanted to meet the next day. The UC affirmed and asked RAMOS where they were meeting. RAMOS replied that he (RAMOS) would advise the UC of the meeting location the morning of the deal.

8.     On October 18, 2019, at approximately 8:45 a.m., the UC called RAMOS at 561-294-XXXX to confirm the deal was still taking place and learn the meeting location. RAMOS initially did not answer the phone, but he called the UC back a short time later to confirm the deal was still on. RAMOS advised the UC to call him when he was driving west on 10th Avenue North and he (RAMOS) would provide the meeting location. At approximately 9:06 a.m., the UC called RAMOS and RAMOS instructed the UC to come to the Walmart parking lot. At approximately 9:13 a.m., RAMOS arrived at the Walmart parking lot driving a red Toyota RAV 4, and was the sole occupant in the vehicle. RAMOS exited his vehicle, walked over to the UC's vehicle, opened the front passenger door, and sat down. RAMOS and the UC spoke briefly before RAMOS retrieved a clear baggy containing a white substance from his right front pocket. He then handed the baggie to the UC. The UC placed the baggie on a scale to determine the weight. The baggie and the white substance weighed approximately 15.10 grams. The UC handed RAMOS $550.00 in U.S. currency. After handing him the money, the UC asked RAMOS about future deals and increasing the amount he could purchase. RAMOS told the UC that he (RAMOS) could provide whatever the UC wanted. The UC asked RAMOS the price for an ounce of cocaine and RAMOS responded that it would cost $1,000 per ounce. The UC advised RAMOS that he (UC) wanted to buy two ounces of cocaine in the near future. RAMOS informed the UC that it would not be a problem and asked the UC to call him (RAMOS) ahead of time. RAMOS then exited the UC's vehicle, returned to his car, and drove away. The white substance field-tested positive for the presence of cocaine.

9.     On October 22, 2018, the UC texted RAMOS at 561-294-XXXX to arrange the purchase of two ounces of cocaine. Through text messages, RAMOS and the UC agreed to meet later during the week to conduct the two ounce deal.

10.    On October 24, 2018, the UC called RAMOS at 561-294-XXXX to inform him that he (UC) was ready to conduct the drug transaction. The two agreed to meet on the morning of October 25, 2018. RAMOS told the UC to call him in the morning when he was in the area of 10th

3

street and I-95.

11. On October 25, 2018, the UC called RAMOS at approximately 8:45 a.m. to inform him he was in route. RAMOS instructed the UC to drive south on I-95 and exit at 10th Avenue North and head west. RAMOS told the UC to call him (RAMOS) back when he was westbound on 10th Avenue. At approximately 9:07 a.m., the UC called RAMOS and informed him that he (UC) was heading west on 10th Avenue. RAMOS told the UC to meet at the Valero gas station located at 3985 10th Avenue North, Lake Worth, FL. The UC did as instructed and drove to the Valero gas station. The UC then called RAMOS and told him he had arrived. RAMOS stated he was in the area and that he could see the UC. RAMOS then pulled in behind the UC's vehicle driving the same red RAV 4. RAMOS then exited his car, walked over the UC's vehicle, and entered the car on the front passenger side. RAMOS held a KFC soft drink cup and, after a brief conversation, he removed from the cup two clear plastic bags containing a white substance. The UC placed the bags inside the center console of his vehicle. The UC then handed RAMOS $2,000 in U.S. currency. They spoke briefly and then RAMOS exited the vehicle. The UC drove away. After the transaction was completed, the suspected cocaine was field tested and tested positive for the presence of cocaine. The cocaine weighed approximately 60 grams.

12. On November 19, 2018, the UC called RAMOS at 561-294-XXXX to arrange a three ounce purchase of cocaine. During this phone conversation, RAMOS asked the UC how much he needed and when he wanted to conduct the transaction. The UC ordered three ounces of cocaine and informed RAMOS that he (UC) needed it the next day. RAMOS told the UC that he (RAMOS) had two ounces in his possession and would have to get the third ounce from his source of supply since he (RAMOS) had sold cocaine to other customers over the weekend.

13. On November 20, 2018, at approximately 8:21 a.m., the UC called Ramos to inform him that he (UC) was driving to the meeting location. RAMOS told the UC to call when he was in the area of 10th Avenue and I-95. Once in the area, the UC called RAMOS who told the UC to meet him at the same Valero gas station. The UC drove to the Valero gas station located at 3985 10th Avenue North, Lake Worth, Florida. Shortly after the UC parked, RAMOS drove into the gas station in the same red Toyota RAV 4. RAMOS parked his vehicle, walked over to the UC's vehicle, and entered the car, sitting on the front passenger side. RAMOS was holding a white Styrofoam cup. RAMOS handed the cup to the UC. Inside the cup were three clear plastic baggies containing a white substance. The UC placed the cup in the center console and then handed

4

RAMOS $3000.00 in U.S. currency. After the transaction was completed, RAMOS and the UC had a brief conversation and then RAMOS exited the vehicle. The suspected cocaine was field tested and was positive for the presence of cocaine. The cocaine weighed approximately 83 grams.

14. Between November and January there were no drug transactions conducted between the UC and RAMOS due to the UC's unavailability.

15. On January 21, 2019, the UC texted RAMOS to arrange the purchase of five ounces of cocaine and to negotiate a future transaction for eight ounces of cocaine. During the text exchange, RAMOS agreed to meet with the UC on January 23, 2019.

16. On January 22, 2019, at approximately 12:33 p.m., the UC called RAMOS to confirm the five ounce deal set for January 23, 2019, and to further discuss the future eight ounce deal. RAMOS informed the UC that he (RAMOS) was ready to conduct the five ounce deal and told the UC to give him a heads-up when the UC was ready to do the eight ounce deal. They agreed to meet the next day to complete the five ounce deal.

17. On January 23, 2019, at approximately 8:28 a.m., the UC called RAMOS to inform him that the UC was exiting I-95. RAMOS asked the UC what type of vehicle he was driving and instructed the UC to proceed to the same Valero gas station. While driving through the gas station, the UC noticed RAMOS sitting in a red four door Honda Civic parked on the east side of the gas station. Once the UC parked his vehicle, RAMOS drove up behind him and parked. He then exited his vehicle and entered the front passenger side of the UC's vehicle. When RAMOS sat down, the UC noticed he was holding a green paper shopping bag, which he handed to the UC. The UC looked inside the bag and saw five clear baggies containing a white substance. The UC told RAMOS it looked good and handed him $5,000 in U.S. currency. RAMOS counted the money, had a brief conversation with the UC about arranging the next transaction, and exited the vehicle. Upon completion of this transaction, the suspected cocaine was field tested and was positive for the presence of cocaine. The cocaine weighed approximately 146 grams.

18. After this transaction was completed, surveillance units, to include aviation, continued to monitor RAMOS' activities. Surveillance units observed RAMOS drive back to his residence, located at XXXX 7th Avenue North, Lake Worth, Florida. While sitting in the parking lot of his residence, RAMOS was observed making contact with an unknown male driving a Palm Tran bus. RAMOS was observed entering the bus and, after a brief time, he exited the bus. The Palm Tran bus then drove away.

19. On January 30, 2019, the UC received a text message from RAMOS asking when the UC wanted to meet to conduct the previously discussed eight-ounce deal. The UC responded and told RAMOS via text that the UC was planning to meet with RAMOS during the week and would call him later that afternoon. Later that day, the UC called RAMOS and asked if RAMOS was ready. RAMOS stated he was ready, but advised the UC that he (RAMOS) only had six ounces of cocaine in his possession and would call his source of supply to get the remaining two ounces.

20. A short time later, RAMOS texted the UC to tell the UC that he (RAMOS) was not able to get any additional cocaine. The UC called RAMOS to ask why RAMOS could not supply the full eight ounces. RAMOS told the UC that his source of supply was not willing to front him more cocaine without prior payment. RAMOS and the UC discussed the transaction set for the next day and ended the conversation.

21. A review of RAMOS' telephone records showed that on January 30, 2019, directly after the first call between RAMOS and the UC, and directly before the text message and second call between RAMOS and the UC, RAMOS only communicated with one telephone number, that is, 561-283-XXXX. Subpoena results confirmed that this phone number was assigned to a cell phone that was subscribed to Manuel FUENTES RIVERA.

22. On January 31, 2019, at approximately 7:54 a.m., the UC called RAMOS to inform him that the UC was traveling south on I-95 and would call him when he was on 10th Avenue North.  At approximately 8:11 a.m., the UC called RAMOS and told him he had arrived at the Valero Gas station. RAMOS told the UC he was on the way. RAMOS arrived, parked his vehicle on the north side of the gas station, and walked over to and entered the UC's vehicle.  The UC observed Ramos holding a plastic supermarket bag. Inside the bag were six small, clear baggies containing cocaine. The UC handed RAMOS $6000.00 in U.S. currency that he had placed inside a brown paper bag. RAMOS opened the bag and counted the money. They spoke briefly about the next transaction and RAMOS exited the car. After the transaction, the cocaine was field tested and was positive for the presence of cocaine. The cocaine weighed approximately 175 grams.

23. After the transaction was completed, surveillance units continued to observe RAMOS as he drove back to the parking lot of his residence. Once back at his residence, RAMOS remained inside his vehicle until a Palm Tran bus arrived at his residence. The driver of the Palm Tran bus, number 5304-P, was observed exiting the bus and making contact with RAMOS. The Palm Tran driver, described as a Hispanic male, made contact with RAMOS and held a brief

6

conversation before getting back in the Palm Tran bus and driving away.

24. Information provided by PBSO and obtained from Palm Tran management verified that FUENTES RIVERA was the driver of Palm Tran bus number 5304-P who agents observed meeting with RAMOS after the previous drug transaction.

25. A review of RAMOS's phone records from the previous narcotics transactions verified RAMOS was in contact with FUENTES RIVERA before and after each drug transaction. For example, RAMOS' phone records showed that on October 12, 2018, RAMOS was in contact with FUENTES RIVERA multiple times before and after the drug transaction. On October 17, 2018, RAMOS contacted FUENTES RIVERA multiple times immediately after he (RAMOS) confirmed the narcotics transaction with the UC. On October 22, 2018, RAMOS exchanged text messages with the UC to arrange the two-ounce cocaine transaction, and then RAMOS immediately contacted FUENTES RIVERA and exchanged multiple text messages with him. On October 24, 2018, immediately after the UC contacted RAMOS, RAMOS texted FUENTES RIVERA. On October 25, 2018, RAMOS sold the UC approximately 60 grams of cocaine. Shortly after the deal was completed, RAMOS called FUENTES RIVERA multiple times. On November 19, 2018, after telling the UC that he (RAMOS) needed to contact his source of supply, RAMOS called FUENTES RIVERA. On November 20, 2018, RAMOS sold the UC approximately 83 grams of cocaine. Following this transaction, telephone records show that RAMOS contacted FUENTES RIVERA. On January 21, 2019, RAMOS contacted FUENTES RIVERA immediately after speaking with the UC about purchasing five ounces of cocaine. On January 22, 2019, RAMOS advised the UC that he (RAMOS) was in the process of obtaining the five ounces of cocaine. Phone records show RAMOS contacted FUENTES RIVERA multiple times that day. On January 23, 2019, the UC purchased approximately 142 grams of cocaine from RAMOS. Shortly after this transaction, RAMOS contacted FUENTES RIVERA and was observed by surveillance units meeting with FUENTES RIVERA in the parking lot of his residence. On January 30, 2019, RAMOS spoke with the UC about conducting an eight ounce deal but was short two ounces. Immediately after this conversation, RAMOS contacted FUENTES RIVERA. After contacting FUENTES RIVERA, RAMOS called the UC to inform the UC that he (RAMOS) was not able to obtain the additional two ounces. On January 31, 2019, RAMOS sold the UC approximately 175 grams of cocaine. Following the transaction, surveillance observed RAMOS meeting with FUENTES RIVERA.

26.     Following the January 31 transaction, after FUENTES RIVERA departed, agents approached RAMOS. RAMOS agreed to speak with agents and was transported to the Palm Beach County Sheriff's Office headquarters where an interview was conducted. RAMOS was informed of his constitutional rights. RAMOS stated he understood those rights and signed a rights card. RAMOS was asked about his involvement in trafficking in cocaine. RAMOS was presented with the dates and times the deals took place and the amounts he sold to the UC. RAMOS admitted to participating in the drug transactions. He identified FUENTES RIVERA as his source of supply. He admitted taking a payment to FUENTES RIVERA after each drug transaction with the UC. RAMOS stated that before and after every deal, he was in contact with FUENTES RIVERA. RAMOS stated he called FUENTES RIVERA the day before every deal, and met with him later that day to get the cocaine, and would call him after the deal in order to pay him. RAMOS was asked about the currency he received during the January 31, 2019 deal and he stated he gave FUENTES RIVERA $3,000, and he (RAMOS) kept $3,000. Agents recovered the $3,000 RAMOS stated he received as payment for his involvement.

27.     RAMOS agreed to cooperate with agents. As a part of his cooperation, RAMOS agreed to allow agents to consensually monitor his phone activity with FUENTES RIVERA and others. During a recorded conversation on February 11, 2019, RAMOS called FUENTES RIVERA to inquire about purchasing cocaine the following week. During this conversation, FUENTES RIVERA advised RAMOS that his (FUENTES RIVERA's) guy had some (cocaine) but got screwed, so he (FUENTES RIVERA) did not have any. FUENTES RIVERA told RAMOS that he (FUENTES RIVERA) would see if he (FUENTES RIVERA) could get some elsewhere and the phone conversation ended.

28.     The next day on February 12, 2019, RAMOS and FUENTES RIVERA exchanged the following text message:

RAMOS: What's up dude? Do you have caramel? I need work.
FUENTES: Still...
RAMOS: Damn, are you dry?
RAMOS: You don't even have a ball?
FUENTES: Another guy told me until next week.
RAMOS: But do you think you will have so I can tell that dude yes for next week?
FUENTES: I don't know. That's the problem.

8

        RAMOS: I'm left poor now…lol

        FUENTES: Shit

29. Despite RAMOS' agreement to cooperate, the information RAMOS provided agents was minimal. Agents requested that RAMOS call FUENTES RIVERA on multiple occasions to inquire about purchasing cocaine, and on each occasion, RAMOS informed agents that FUENTES RIVERA told RAMOS that he (FUENTES RIVERA) was still dry. In addition, agents had other information indicating that RAMOS continued to be involved in the sale of illegal narcotics. For example, on April 6, 2019, phone records showed RAMOS communicating via text with an unknown individual. In this text message string, RAMOS asked the unknown individual for money. The unknown individual responded and told RAMOS that he had fifty. The unknown individual then asked if RAMOS was still serving. RAMOS replied that he was not. The unknown individual asked him for a "20". RAMOS responded and told the unknown individual that he (RAMOS) was retired. The unknown individual told RAMOS that he did not believe him and told RAMOS, "I got your 50 plus 20". RAMOS replied that he did not have any, but then told the unknown individual, "I'll see you in twenty minutes".

30. In another conversation via text messaging on April 18, 2019, phone records showed RAMOS communicating via text with another unknown individual. In this text string, RAMOS and the unidentified individual appeared to be speaking about drug amounts. The unidentified individual asked, "Isn't it true here we stay with an 8," indicating possibly an eight ball of cocaine. The unidentified individual then texted, "you took one of them". RAMOS replied, "No I took 50 and you stayed with everything else." The unidentified individual responded with the following text messages: "I only stayed with an eight and you took everything, you remember," "Julio said he did not stay with any of it," and "Remember you left with 100 and you took the chocolate."

31. Based on these communications, it appeared that RAMOS was still involved in the sale of illegal narcotics and was not being honest with agents when he advised that his source of supply no longer had access to cocaine.

32. Agents subsequently lost all contact with RAMOS and spent months searching for him.

Based on the facts and information set forth in this affidavit, I respectfully submit that there is probable cause to believe that on or about October 12, 2018 through on or about January 31,

9

2019, JONNY ALEXANDER RAMOS and MANUEL ANTONIO FUENTES RIVERA conspired to possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

FURTHER YOUR AFFIANT SAYETH NAUGHT

_____
Shelton Hammonds
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 22 day of August 2019, in West Palm Beach, Florida.

_____
BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

10